665 A.2d 1156

STATE OF NEW JERSEY v. FRANZ SZAWRONSKI, DEFENDANT.

Superior Court of New Jersey
Law Division
Camden County

Decided May 1, 1995.

*Leslie B. Dicker,* Assistant Prosecutor, for the State.

*Scott H. Marcus,* for defendant.

HORNSTINE, J.S.C.

Defendant, Franz Szawronski, was charged in Indictment 2820–10–94 with two counts of issuing a bad check contrary to the provisions of *N.J.S.A.* 2C:21–5, one count of theft by deception in violation of *N.J.S.A.* 2C:20–4, and one count of deceptive business practices prohibited by *N.J.S.A.* 2C:21–7(h).

## *FACTUAL HISTORY*

The State alleges that the proofs will show that the victim, Charles Hurchalla, is the owner and President of Petron Oil Corporation (Petron). Joseph Chismark was employed by Petron. Chismark was responsible for obtaining new accounts and maintaining existing accounts for Petron by selling diesel fuel, gasoline and heating oil.

Franz Szawronski, the defendant herein, and his wife, are the owners of Tri–State Fuel Services, Incorporated (Tri–State). Chismark and Szawronksi met in 1991. In 1992 Szawronski asked Chismark to refer potential customers to Tri–State. In exchange for any referral which resulted in business for Tri–State, Chismark would receive a commission which was hidden from Petron.

In August 1992, Petron ceased doing business with Caretta Trucking Company, Incorporated, (Caretta Trucking). Chismark referred the Caretta Trucking account to Tri–State in exchange for a commission. Caretta Trucking purchased diesel fuel from Tri–State from the end of August 1992 through November 2, 1992. Their business relations ended when Caretta Trucking failed to pay Tri–State for the last nine shipments, leaving a debt of $56,298.75. On November 5, 1992 Caretta Trucking filed for bankruptcy.

During the Spring of 1993, Szawronski contacted Chismark to discuss prospective business relations between Petron and Tri–State. Subsequently, Petron gave Tri–State a $75,000 line of credit and Tri–State began purchasing fuel from Petron. As of November 10, 1993, Tri–State's account balance with Petron was $123,630.66.

On November 11, 1993, Tri–State issued check number 1190 to Petron in the amount of $45,000 drawn on First Fidelity Bank. On Friday, November 12, 1993, Franz Szawronski stopped payment on the check. Later that evening he met with Joseph Chismark and ordered approximately $40,000 worth of fuel which was to be delivered by Petron to Tri–State customers. Chismark requested an additional payment. Szawronski tendered check number 1199 dated November 15, 1993, payable to Petron in the amount of $77,704.81. On Monday, November 15, 1993, Szawronski withdrew all moneys from the bank account on which check number 1199 was written, transferring the funds to a new account which he opened in Tri–State's name with the same bank.

On November 15, 1993, Tri–State's bank refused payment on check number 1190 due to the stop payment order previously requested by defendant and also refused payment on check number 1199 due to insufficient funds. Check number 1199 was presented for payment again on November 23, 1993, but was not honored for lack of funds.

Petron sought legal counsel to resolve the situation. A meeting was held at the law offices of Petron's attorneys on November 29, 1993. Present at the meeting were Charles Hurchalla, his attorneys Kevin Gibson and Matthew Ryan, Franz Szawronski and his attorney, Augustus Knestaut.

The meeting [1] began with a discussion regarding payment to Petron for the two checks which had not been honored. Tri–State

---

[1] The court has received statements of all persons present at the meeting with the exception of defendant. The above facts basically paraphrase the collective

attempted to resolve the matter by offering to pay $45,000 over eighteen months without interest. Eventually Tri-State increased the amount to $60,000 with the same terms. Representatives for Petron refused Tri-State's offer. Charles Hurchalla indicated that he was outraged that as a businessman Szawronski would not pay what he owed. Charles Hurchalla asked Szawronski why he did this to him and Szawronski retorted with words to the effect of "How else was I going to get you?" Szawronski blamed Petron for Caretta's outstanding debt to Tri-State, alleging that Petron purposely failed to advise them of Caretta's insolvency and that Chismark purposely introduced Tri-State to a poor financial risk.

Gibson, Ryan and Hurchalla recall Szawronski's comments as an acknowledgment that he issued the two checks with the intent to retaliate against Petron for Chismark's actions in referring Caretta, a poor financial risk, to Tri-State.

## LEGAL ISSUE

Defendant brings this motion before trial to preclude the testimony of the defendant's statements during the meeting of November 29, 1993. The issue at the center of the controversy is the admissibility of certain representations under N.J.R.E. 408. The State contends that this court should rely upon a literal and plain interpretation of N.J.R.E. 408 in conjunction with N.J.R.E. 410 and 803(b)(1). There appear to be no reported decisions in this state addressing this issue.

N.J.R.E. 408, entitled Settlement Offers and Negotiations, reads as follows:

When a claim is disputed as to validity or amount, evidence of statements or conduct by parties or their attorneys in settlement negotiations, including offers of compromise, shall not be admissible to prove liability for, or invalidity of, or amount of the claim. Such evidence shall not be excluded when offered for another purpose; and evidence otherwise admissible shall not be excluded merely because it was disclosed during settlement negotiations.

recollections of Kevin Gibson, Esq., Matthew Ryan, Esq., Augustus Knestaut, Esq., and Charles Hurchalla.

The holding in *United States v. Baker and Mazzilli,* 926 *F.*2d 179, 180 (2nd Cir.1991) is persuasive.

In *Baker and Mazzilli, supra,* the defendants were convicted of offenses arising out of their possession of stolen electronic equipment. Special Agents Conlin and Nichols visited the home of Mazzilli's father in Brooklyn, where they encountered Mazzilli. Upon questioning, Mazzilli led the agents to the basement of the house, which was filled with boxes of the stolen electronic equipment. As the agents seized custody of the goods, Mazzilli asked Nichols whether she knew an FBI agent named George Hanna. After Nichols answered affirmatively, Mazzilli explained that he had heard that "Hanna has made deals for other people in the past" and "has a reputation in the neighborhood for making deals." Mazzilli proposed to Nichols that she "speak with George to see if ... maybe we can get together and make some sort of deal for myself." The defendant, Mazzilli contended that the district court erred in admitting Nichols' testimony about what Mazzilli said to her. He claimed that *Fed.R.Evid.* 408 precluded admission of his statements to Nichols.

*Federal Rule of Evidence (Fed.R.Evid.)* 408 states:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

The Court of Appeals in *Baker* and *Mazzilli, supra,* held as follows:

We believe it fairly evident that the Rule [408] applies only to civil litigation. The reference to "a claim which was disputed as to either validity or amount" does not easily embrace an attempt to bargain over criminal charges. Negotiations over immunity from criminal charges or a plea bargain do not in ordinary parlance constitute discussions of a "claim" over which there is a dispute as to "validity" or "amount." Moreover, *Fed.R.Crim.P.* 11(e)(6) explicitly addresses the exclusion of

plea bargain negotiations and limits the statements excluding to those made to an "attorney" for the government. The very existence of Rule 11(e)(6) strongly supports the conclusion that Rule 408 applies only to civil matters. We therefore hold that Rule 408 did not preclude testimony as to Mazzill's statements to Nichols.

Applying a plain interpretation to *N.J.R.E.* 408, it appears that the intent is to address situations where the "validity or amount of claim" is disputed and a party's statements are offered to prove "liability for, or invalidity of, or amount of the claim." This is not, however, the crux of the issue.

The State seeks to introduce defendant's comments for the distinct purpose to show his motive in issuing the bad checks.

Policy arguments considered by federal courts when resolving this issue in the context of *N.J.R.E.* 408 are persuasive. In *U.S. v. Gonzalez*, 748 *F.*2d 74, 78 (2nd.Cir.1984) the court stated in pertinent part:

[T]he primary policy justification for Rule 408's exclusion in the civil context does not apply to criminal prosecutions. Rule 408 is premised on the idea that encouraging settlement of civil claims justifies excluding otherwise probative evidence from civil lawsuits. *Fed.R.Evid.* 408 advisory committee note. However, encouraging settlement does not justify excluding probative and otherwise admissible evidence in criminal prosecutions. The public interest in the disclosure and prosecution of crime is surely greater than the public interest in the settlement of civil disputes. It follows that since nothing in the Rule specifically prohibits receiving in evidence the admissions and statements made at a conference to settle claims of private parties, they are admissible in any criminal proceeding.

The intent and purpose of both *Fed.R.Evid.* 408 and *N.J.R.E.* 408 are similar. The clear reading of our rules of evidence suggests that *N.J.R.E.* 408 should apply solely to civil proceedings. Nothing in *N.J.R.E.* 408 specifically prohibits the receipt of evidence in criminal proceedings regarding any admissions or statements made at a conference to settle claims of private parties. *See U.S. v. Gonzalez*, 748 *F.*2d 74 (2d Cir.1984) and *U.S. v. Prewitt*, 34 *F.*3d 436 (7th Cir.1994).

The public interest in the prosecution of crime is greater than the public interest in the settlement of civil disputes. *U.S. v. Gonzalez, supra.* at 78.

Accordingly, defendant's purported statements at the meeting on November 29, 1993, are admissible to the extent they relate to admissions of guilt or other statements not made to resolve the amount in controversy. *See also* *N.J.R.E.* 803(b)(1).